## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW HAMPSHIRE

**Margaret Juraska**

   **v.**                            Civil No. 10-cv-596-PB
                                          Opinion No. 2011 DNH 184

**Michael J. Astrue, Commissioner,**
**Social Security Administration**

### MEMORANDUM AND ORDER

Margaret Juraska seeks judicial review of a decision by the Commissioner of the Social Security Administration denying her application for disability insurance and supplemental security income benefits. Juraska alleges numerous errors in the ALJ's assessment of her residual functional capacity, and contends that the ALJ's determinations about her past relevant work and her vocational options were flawed. For the reasons provided below, I affirm the Commissioner's decision.

### I.  BACKGROUND[1]

Juraska applied for disability insurance and supplemental security income benefits ("DIB" and "SSI") on October 8, 2008,

---

[1] Except where otherwise noted, the background information is taken from the parties' Joint Statement of Material Facts (Doc. No. 11). See LR 9.1(b). Citations to the administrative record are marked "Tr."

when she was 47 years old.  She claimed that her disability
began on January 1, 2007, and was due to a chronic meniscus tear
of her right knee, Hepatitis C, affective disorder, degenerative
disc disease, obesity, asthma, and pancytopenia.  She has an
11th grade education, and her past relevant work includes work
as a mental health worker and a store clerk.[2]

Juraska's claims were denied on May 6, 2009.  She requested
a hearing, and after appearing and testifying on June 25, 2010,
her claims were again denied by Administrative Law Judge ("ALJ")
Dory Sutker.  The Decision Review Board selected her case, but
did not complete its review within the time allotted, thus
leaving the ALJ's decision as the final decision of the
Commissioner.

A.  **Medical History**

On June 18, 2001, Juraska saw Dr. A. Frederick Hartman, of
the New England Family Health Associates.  He reported that
Juraska had a diagnosis of Hepatitis C ("HepC"), explaining that

---

[2] The Joint Statement of Material Facts also includes
telemarketing as past relevant work.  Because Juraska contests
the ALJ's finding on whether her work as a telemarketer was
sufficiently extensive to constitute past relevant work, I
assume Juraska erred in assenting to its inclusion in the
statement of facts.  I do not construe that oversight to work
against her claim.

2

she "works in State Hospital System, in February 01 sustained an
exposure, a patient apparently urinated in her face and then bit
her, breaking her skin."  In August, Dr. Hartman noted that a
live biopsy was being considered because Juraska was concerned
about how much damage had already been done.  In September, he
recorded that, in addition to her chronic active HepC, she was
moderately obese.  By mid-December, Juraska had begun a six-week
course of Rebetron for her HepC.

    Dr. Hartman's February 12, 2002 note elaborated on
Juraska's symptoms and medication: she was "beginning to report
fatiguing easily; unable to work; sleeping a lot; quite
irritable; started on Celexa; significant depression."  On April
23, Dr. Hartman observed that Juraska was "very, very upset."
She complained of severe joint and hip pain and an inability to
function, and told the doctor that her conditions had forced her
to take time off work.  On August 15, the doctor documented her
ongoing issues with "chronic active HepC; neutropenia and anemia
. . . depression; [and] recurring epistaxis (nosebleeds)."[3]

---

[3] Neutropenia is defined as the "presence of abnormally small
numbers of neutrophils in the circulating blood." Stedman's
Medical Dictionary 1317 (28th ed. 2006) [hereinafter Stedman's].
Neutrophils are a type of "mature white blood cell." Id.
Anemia is defined as a deficiency in the number of red blood

Juraska saw Dr. Hartman again on September 5, and stated that she had experienced several episodes of syncope,[4] as well as several episodes of near syncope that she was able to deal with by pulling over to the side of the road or by lying down.  Dr. Hartman also noted that she was suffering from dizziness, chronic active HepC, and pancytopenia[5] secondary to medication. Her depression, however, had improved.

Doctor's notes from the following months show that she began to recuperate.  On October 3, 2002, although Dr. Hartman reported that she had hypothyroidism,[6] he also noted that she was "feeling much improved."  On January 7, 2003, Dr. Hartman noted that she had "considerably improved; now back to work, not as depressed."

Subsequent appointments reveal that her personal and medical situation soon regressed.  On October 24, 2003, Dr.

---

cells, the amount of hemoglobin, or the volume of packed red blood cells in the blood.  Id. at 78.

[4] Syncope is a "[l]oss of consciousness and postural tone caused by diminished cerebral blood flow."  Stedman's at 1887.

[5] Pancytopenia is a "[p]ronounced reduction in the number of erythrocytes, all types of leukocytes, and the blood platelets in the circulating blood."  Stedman's at 1411.

[6] Hypothyroidism is a defined as a "[d]iminished production of thyroid hormone."  Stedman's at 939.

Hartman stated that she "stopped meds for a couple months;
[then] was into a lot of job changes and other stressful events;
she has now lost her job and insurance." At a follow-up
appointment on November 4, he noted she was "moderately obese
[with] chronic active HepC."

Over two years later, on February 16, 2006, Juraska visited
Dr. Diane Arsenault at the Mid-State Health Center. The doctor
reported that Juraska had come for a HepC follow up, that her
symptoms had gotten worse due to recurrent fatigue, and that
Juraska wanted to pursue further treatment. She also noted that
Juraska had recently suffered adverse life events, including the
loss of her job, and was experiencing depression.

Juraska saw Dr. Brian Berk of the Dartmouth-Hitchcock
Medical Center on May 2, 2006. Dr. Berk stated that she

> was in usual state of health until 2000
> [when she] was exposed to urine from patient
> and she had formal testing for infection
> risk. She was noted to have (+) HCV Ab,
> high viral load with genotype 1 af. Her
> main complaints include fatigue,
> arthralgias, mood disorder. She frequently
> got colds and exacerbation of asthma and
> bronchitis. In 6/01 she was treated with
> Rebetron with only 800mg of ribavirin for
> greater than 9 months. She was only a
> partial responder to therapy. Her only
> complaints on therapy included fatigue,
> malaise, and hair loss. The therapy was

5

> stopped.  She complained of severe fatigue,
> lightheadedness, dizziness, dehydration
> requiring IVFs, anemia, mood disorder, hair
> loss, weight loss, and arthralgias.  In
> 10/03, she had liver biopsy which showed
> grade I, stage 0 disease.  No further
> evaluation for her liver disease has been
> done since.[7]

Dr. Berk observed that Juraska looked well, and her objective
examination yielded normal findings in all areas tested.

By late October 2006, Juraska reported experiencing back
pain.  On October 25, Dr. Arsenault noted the increased size of
a lump on her mid-thoracic spine, and that her pain was
"constant, moderate in intensity, aching, and burning."  On
December 1, Juraska visited Mid-State Health Center, and
complained of pain in her back that was located between her
shoulder blades and coming from her right shoulder.

On January 30, 2007, Juraska slipped on ice and injured her
right knee.  She went to the Speare Memorial Hospital emergency
room, where she was diagnosed with internal derangement of the
knee.  Juraska was referred for knee rehabilitation, and
received an initial evaluation on February 26.  Because she
failed to return for physical therapy, she was discharged from
rehabilitation on March 12.  At the initial evaluation, she

---

[7] Arthralgia is defined as joint pain.  Stedman's at 159.

discussed the impact of her medical conditions on her work as a cook/waitress, stating that she had been forced to cut back because of the job's demand that she be on her feet all the time.

On March 2, 2007, Juraska saw Barbara Hatch, APRN, at the Mid-State Health Center for a follow-up appointment for her knee.  She revealed that her husband had recently been diagnosed with a mass in his lung, and that she was experiencing feelings of stress.  In addition to her knee pain, Ms. Hatch also noted that Juraska was suffering from asthma with chronic obstructive pulmonary disease, backaches, HepC, morbid obesity, and pain in her foot and hip.

On April 3, Juraska went to the Dartmouth-Hitchcock Medical Center for her continued knee pain.  She told Richard Peterson, PA, that she had been having "episodes of instability," where she would experience "a very sharp excruciating pain where her knee will buckle."  Despite the pain, she reported that she was still working on her feet at the bakery, which was causing a substantial amount of discomfort and swelling.  Mr. Peterson diagnosed Juraska with a traumatic knee sprain with internal derangement and a possible meniscal tear.  A radiology

examination that same day revealed "medial weight-bearing and degenerative narrowing of the medial joint compartment on the right [and] calcified pheboliths, likely secondary to varicose veins."[8]  One week later, Juraska returned to the Mid-State Health Center, where she complained to Ms. Hatch about her ongoing knee and upper-back pain.

An MRI was performed on Juraska's knee on May 3, 2007.  It revealed a "tear [of the] posterior horn of the medial meniscus with associated displacement and degenerative changes [and] a chronically deficient knee which probably predisposed her to the posterior horn medial meniscus tear."  Juraska had an MRI performed on her back on May 22.  The report from radiology stated that an "MRI abnormality represents hypertrophic facet disease involving the right inferior articulating facet of 79";[9] there was "[a]ir within the left 10th costovertebral joint,

---

[8] A phebolith is a "calcific deposit in a venous wall or thrombus."  Stedman's at 1481.

[9] Hypertrophy is the increase in bulk of a part or organ, and a facet is a "small smooth area on a bone or other firm structure."  Stedman's at 690, 929.

likely degenerative in nature";[10] and there were "[m]ild degenerative changes at T7-8 and T9."  The report also recommended further MRI imaging with a smaller field of view to better define an "[e]ffacement of the thecal sac in the right posteriorly at the T9-10 level."[11]

Juraska saw Ms. Hatch on August 23, 2007.  Ms. Hatch noted her continuing issues with obesity, HepC, pancytopenia, and anemia.  Objective physical and mental examinations, however, all yielded normal results.  The findings included normal gait, normal reflexes, normal muscle strength, and normal musculoskeletal range-of-motion, strength, and tone.  Juraska saw Ms. Hatch again on November 27, 2007, complaining of knee pain that had persisted from her fall nine months previous.  Although her pain was described as stable and without radiation, Juraska expressed that it was constant, aching, and of moderate intensity.

On April 14, 2008, Juraska saw Dr. Berk at the Dartmouth-Hitchcock Medical Center.  He noted that he had not seen her

---

[10] A costovertebral joint is a joint near "the ribs and bodies of the thoracic vertebrae which with they articulate."  Stedman's at 451.

[11] Thecal refers to relation to a "sheath, especially a tendon sheath."  Stedman's at 1970.

since May of 2006, even though she was supposed to have returned for a CT scan and colonoscopy.  Dr. Berk's notes from that visit extensively documented her medical history, specifically: neck pain, lower-back and buttock pain, right knee pain, right foot pain from a 2003 fracture, numbness along parts of her right leg and foot, a throbbing sensation in her liver, a recent upper respiratory infection, sweats, stress incontinence, degenerative hyptertrophic facet disease, HepC, paresthesia,[12] hand numbness, weakness in her right arm and both hands, and pain in her upper thoracic spine.  Dr. Berk discussed multiple treatment options and ordered an MRI of her cervical spine to look for a herniated disk or spondylosis.[13]  He also mentioned that EMG testing might be necessary in the future.

Despite her lack of health insurance, Juraska received examinations and treatment for her various ailments on nine additional dates through the end of 2008.

On February 4, 2009, Juraska went to the emergency room at the Speare Memorial Hospital.  She explained that she was

---

[12] Parasthesias is a "spontaneous abnormal usually nonpainful sensation" like burning or pricking.  Stedman's at 1425.

[13] Spondylosis is the stiffening or fixation of the vertebra as the result of a disease process, with fibrous or bony union across the joint.  Stedman's at 95, 1813.

helping her boyfriend lift the tailgate of a truck onto the hinge when it slipped and fell on her left foot.  Her foot and ankle were both tender and swollen, but an X-ray did not show evidence of a fracture.  Juraska was diagnosed with a contusion/sprain of the right foot.

Juraska returned to the Dartmouth-Hitchcock Medical Center on May 12, 2009 for a chronic HepC follow-up with Anne Evans, ANRP.  She recounted a number of recent stressful events, including the foreclosure and auction sale of her home, the repossession of her truck, and her continuing unemployment.  In addition to stress and tearfulness, she stated that since beginning HepC treatment she had been having muscle jerks and leg cramping at night, her eyesight was occasionally fuzzy, and she would get short of breath with activity.

The next day, Ms. Evans wrote a letter to the bank holding Juraska's loan, in the hope of stopping or postponing the foreclosure of her house.  The letter detailed that Juraska had "begun a very difficult medical treatment which usually causes numerous, often severe side effects.  Those that are most often a problem are flu-like symptoms, fatigue, weakness, anemia, weight loss, nausea, vomiting, memory and concentration

difficulties, depression, irritability and joint pains." Evans wrote that patients undergoing the treatment often need to take leave from work, and that symptoms last through the duration of treatment and possibly for several weeks afterwards, becoming worse as treatment progresses. She noted that Juraska had completed only 5 of the planned 72 weeks of treatment. In conjunction with the need to refrigerate her medication, Evans explained that the rough course of treatment made it in Juraska's best interests to be able to stay at home.

On May 20, Ms. Evans noted in a medical record that Juraska's viral load was "still quite high." Evans had spoken with Dr. Arifa Toor, who recommended an increase in medication and another check of her viral load in one month.

Juraska returned for treatment on June 16, and stated that she was feeling "ok" but had been lacking stamina. Although her home had been sold at auction, she explained that she was still living there and might not have to move. She was seeing her counselor a couple times a month and did not think she had become more depressed. She complained of cramping in her legs, insomnia, irregular menses, and a loss of taste.

Ms. Evans spoke with Juraska by phone on July 1, and explained that the most recent check of her viral load confirmed that she was not responsive to HepC treatment. Evans passed on Dr. Toor's recommendation that Juraska discontinue her medication and discuss other options. In a July 21, 2009 office note, Evans wrote that Juraska was suffering from Hepatitis C, "grade 2/4, stage 3/4," in addition to asthma, borderline hypothyroidism, back pain, and depression.

On June 7, 2010, Dr. Toor wrote a letter to Juraska detailing recent lab results. He stated that her liver function was stable and that her blood count was normal.

## B. <u>Administrative History & Subsequent Medical History</u>

On February 2, 2009, a physician for the Social Security Administration, Dr. Hugh Fairley, reviewed Juraska's medical records and assessed her physical RFC. He opined that she retained the ability to frequently lift/carry 10 pounds and to stand/walk for a maximum total of 2 hours and sit for about 6 hours in an 8-hour workday. He found that she could occasionally climb ramps/stairs, balance, stoop, kneel, crouch, and crawl. She could not climb ladders/ropes/scaffolds. She needed to avoid all exposure to hazards like machinery and

13

heights, and avoid concentrated exposure to fumes, odors, dusts, gases, and poor ventilation.

Juraska began psychotherapy with Dr. Tonya Warren on March 19, 2009, for her Major Depressive Disorder.  Dr. Warren opined that her depression had no impact on her abilities to understand, remember and carry out simple instructions, or make simple work-related decisions.  She also opined that her depression would only mildly impact her abilities to interact appropriately with the public, coworkers, and supervisors. Additionally, she stated that "fatigue associated both with depression and Ms. Juraska's medical conditions would hinder her ability to work consistently."

On April 8, 2009, Dr. David Paris administered a consultative medical examination to evaluate Juraska for functional loss due to depression and anxiety problems.  He noted that her grooming and gait appeared normal.  Juraska told Dr. Paris that she contracted HepC from a blood transfusion in the 1980s.  She also explained to him that until a year ago she had worked her whole life, although Dr. Paris noted that in recent years "she appears to have been employed by friends who were as tolerant and understanding as possible but who

14

eventually were not able to tolerate her uneven work attendance."

Dr. Paris conducted a mental status exam, which yielded relatively normal results, aside from evidence of low-average intellectual functioning.  He determined that Juraska could understand and remember simple instructions and complete simple tasks, but her stamina, ability to sustain focus, and ability to keep and maintain work attendance were impaired by her physical and psychological problems.  She would be able to make simple decisions and handle minor stressors when able to be at work, and she would be able to get along with supervisor, coworkers and the public on a daily basis, even if her depression might keep her isolated from others.  Dr. Paris found that her major problem would be stability over time; uneven attendance would be a larger issue than work performance.  Dr. Paris diagnosed Juraska with moderate depression and an anxiety disorder.

On May 4, 2009, a medical consultant, M. Bohnert, reviewed the evidence of Juraska's mental health treatment and assessed her mental RFC.  The consultant opined that she could understand and remember tasks involving one to three steps, perform simple tasks at an adequate pace on a consistent and sustained basis,

and respond appropriately to change pertaining to tasks of one to three steps.

On June 21, 2010, Ms. Hatch completed a Medical Source Statement of Ability to Do Work-Related Activities (Physical). She indicated that Juraska could lift/carry up to 10 pounds occasionally, and could stand, walk, and/or sit between 15 and 60 minutes out of an 8-hour workday. She noted that Juraska could occasionally push and pull, but could not perform postural activities, such as climbing stairs, kneeling, crawling, and crouching. Evans also determined that Juraska should avoid all but occasional exposure to humidity, dust, and noise.

At the administrative hearing on June 25, 2010, Juraska testified that she was experiencing fatigue, confusion, and emotional issues. She expressed that she had continuing trouble with her knee, degenerative disc disease, right hip pain, foot pain, asthma, and chronic obstructive pulmonary disease. She testified that in the morning she could barely move and that her roommate had to bring medications to her before she could even get up to go to the bathroom; otherwise she would have to "hobble." She had good days and bad days, and would occasionally be so bloated that she could only wear certain

16

clothes.  She stated that she frequently took afternoon naps,
which would last up to 3 hours.  Explaining her activities of
daily living, Juraska testified that she was able to brush her
teeth and wash her face, and that her friends often came by to
do dishes and other necessary chores.

**C.  <u>ALJ's Opinion</u>**

On July 14, 2010, ALJ Sutker issued an opinion denying
Juraska's claim.  The ALJ determined that Juraska had a number
of severe impairments -- chronic right knee meniscus tear,
Hepatitis C, affective disorder, degenerative disc disease,
obesity, asthma, and pancytopenia -- but that she did not have a
listing level impairment.  Considering the evidence in the
record, Juraska's assertions about her symptoms and their
limiting effects, and the opinions of medical providers, the ALJ
found that Juraska had the RFC to perform sedentary work with
certain additional limitations.  Based on this RFC, the ALJ
determined that Juraska was capable of performing her past
relevant work as a telemarketer, as well as other jobs existing
in significant numbers in the national economy, and was
therefore not disabled.  Because the Decision Review Board did

not act on her claim, the ALJ's decision is the final decision of the Commissioner.

## II.   <u>STANDARD OF REVIEW</u>

Under 42 U.S.C. § 405(g), I am authorized to review the pleadings submitted by the parties and the administrative record and enter a judgment affirming, modifying, or reversing the "final decision" of the Commissioner.  My review "is limited to determining whether the ALJ used the proper legal standards and found facts [based] upon the proper quantum of evidence." Ward v. Comm'r of Soc. Sec., 211 F.3d 652, 655 (1st Cir. 2000).

The findings of fact made by the ALJ are accorded deference so long as they are supported by substantial evidence.  <u>Id.</u> Substantial evidence to support factual findings exists "'if a reasonable mind, reviewing the evidence in the record as a whole, could accept it as adequate to support his conclusion.'" Irlanda Ortiz v. Sec'y of Health and Human Servs., 955 F.2d 765, 769 (1st Cir. 1991) (per curiam) (quoting Rodriquez v. Sec'y of Health and Human Servs., 647 F.2d 218, 222 (1st Cir. 1981)).  If the substantial evidence standard is met, factual findings are conclusive even if the record "arguably could support a

different conclusion." Id. at 770.  Findings are not conclusive, however, if they are derived by "ignoring evidence, misapplying the law, or judging matters entrusted to experts." Nguyen v. Chater, 172 F.3d 31, 35 (1st Cir. 1999) (per curiam).

The ALJ is responsible for determining issues of credibility and for drawing inferences from evidence on the record. Ortiz, 955 F.2d at 769.  It is the role of the ALJ, not the court, to resolve conflicts in the evidence. Id.

The ALJ follows a five-step sequential analysis for determining whether an applicant is disabled. 20 C.F.R. §§ 404.1520, 416.920.  The applicant bears the burden, through the first four steps, of proving that her impairments preclude her from working. Freeman v. Barnhart, 274 F.3d 606, 608 (1st Cir. 2001).  At the fifth step, the Commissioner determines whether work that the claimant can do, despite her impairments, exists in significant numbers in the national economy and must produce substantial evidence to support that finding. Seavey v. Barnhart, 276 F.3d 1, 5 (1st Cir. 2001).

### III.  ANALYSIS

Juraska contends that the ALJ erred in the residual functional capacity assessment by failing to account for the extent and severity of her symptoms, improperly weighing her credibility, and improperly weighing opinion evidence from medical sources.  Juraska also contends that the ALJ's assessment of her vocational history and abilities was flawed. The Commissioner moves to affirm the decision.

## A.  Accounting for Extent and Severity of Symptoms

Juraska argues that the ALJ failed to take into account a number of her symptoms and limitations, and that these omissions caused the ALJ to err in coming to the RFC determination.  A review of the ALJ's decision reveals, however, that in most of the instances where the ALJ allegedly ignored a symptom or limitation, the ALJ addressed the evidence cited by Juraska and found it unpersuasive in light of other evidence.  Where conflicting evidence exists in the record, a claimant cannot successfully overturn an ALJ's determination merely by referencing the evidence that supports her contentions.  See Ortiz, 955 F.2d at 769 (resolution of conflicts in the evidence is a task for the Commissioner, not the courts).  Although Juraska does raise certain evidence not discussed by the ALJ,

none of that evidence is material, and it is insufficient to disturb the ALJ's decision.  I find that Juraska has failed to show that the findings of the ALJ are unsupported by substantial evidence.

First, Juraska contends that the ALJ failed to recognize that she can sit for only 30 to 60 minutes in a workday.  The ALJ noted that Ms. Hatch's opinion included such a limitation, but ultimately found that Ms. Hatch's opinion was not supported by the record, including the opinion of Dr. Fairley, and was inconsistent with Juraska's activities of daily living, such as sitting and reading, watching television, and doing crafts. Substantial evidence supports the ALJ's determination.

Second, Juraska argues that the ALJ failed to recognize her limitations pertaining to standing and walking.  Despite Juraska's claim to the contrary, however, the ALJ did take note of her use of a cane.  Tr. at 14.  More importantly though, the ALJ accounted for Juraska's limitations in finding that she qualified for work at the sedentary level, which requires no more than occasional standing and walking.  See 20 C.F.R. §§ 404.1567(a), 416.967(a).  Even if one wholly credits Juraska's assertions on this point -- such as her limited ability to walk

without a cane, her pain, and that she no longer takes long walks in the woods[14] -- she has failed to explain why her standing and walking limitations are inconsistent with the sedentary work level.

Third, Juraska claims that although the ALJ recognized the symptoms caused by the side effects of her HepC treatment, the ALJ failed to recognize the impact of her physical symptoms caused by the disease itself, specifically the swelling in her hands and other joints and a weakened immune system.  The ALJ discussed in substantial detail Juraska's HepC, deemed to be a severe impairment, and the side effects from treatment.  The ALJ did not specifically mention swollen hands and joints or a weakened immune system, but the only limitation that Juraska alleges would stem from these symptoms is an inability to work with the public because of a risk of frequent sickness.  The ALJ's RFC determination explicitly included that Juraska could have "little, if any, face to face interactions with the general public," and thus, does not conflict with the only additional limitation asserted by Juraska.  Furthermore, Juraska has failed to point to any record evidence showing that she suffered

---

[14] I would note that as recently as January 2009, Juraska stated that she enjoyed walking alone in the woods.  Tr. at 166.

swollen hands and joints, the severity of that symptom, or how
it limits her activities.

Fourth, Juraska contends that the ALJ failed to account for
her psychiatric difficulties, in particular difficulties with
crowds, concentration problems, anxiety, and depression.  The
ALJ limited Juraska's work to "routine and repetitive tasks in
an environment with few, if any, workplace changes, and little,
if any, face to face interactions with the general public."
Juraska has failed to adequately identify any conflict between
her mental abilities and her capacity to perform work with those
stipulated limitations.

Fifth, Juraska argues that the ALJ ignored evidence of her
attendance problems.  She focuses on the statement by Dr. Paris,
upon whom the ALJ placed great weight, that "her ability to keep
a schedule and maintain work attendance[] appear to be
significantly adversely affected by her physical and
psychological problems."  In the portion of his opinion devoted
specifically to adaptation to work and work-settings, however,
Dr. Paris stated that Juraska "can keep a schedule and attend
work."  Tr. at 462.  The ALJ expressly relied on that latter,
more definitive statement, in conjunction with other evidence in

23

the record to the same effect.  His finding is therefore supported by substantial evidence.

Sixth, Juraska contends that the ALJ failed to consider her upper extremity limitations, including weakness and decreased sensation in her arms and hands.  Dr. Fairley, the agency examiner whose opinion was given great weight, considered these injuries in coming to his opinion about the level of exertion Juraska could sustain at work.  And although the ALJ did not specifically discuss upper extremity limitations, Juraska fails to explain why such limitations are inconsistent with her ability to perform sedentary work.

In sum, Juraska has failed to identify any mistake or omission that would render the ALJ's conclusions unsupported by substantial evidence.

## B.  Credibility of Juraska's Assertions

Juraska argues that the ALJ improperly found her statements about her symptoms, and the difficulties and limitations they imposed, not credible.  "Because symptoms, such as pain, sometimes suggest a greater severity of impairment than can be shown by objective medical evidence alone, any statements of the individual concerning his or her symptoms must be carefully

24

considered[.]"   SSR 96-7p, 1996 WL 374186, at *3 (July 2, 1996);

see also 20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3).   A two-step

analysis governs an ALJ's evaluation of symptoms such as pain.

SSR 96-7p, 1996 WL 374186, at *2.   First, the ALJ considers

whether the claimant is suffering from "an underlying medically

determinable physical or mental impairment . . . that could

reasonably be expected to produce the individual's pain or other

symptoms."   Id.   If the claimant meets that threshold, the ALJ

moves to the second step:

> the adjudicator must evaluate the intensity,
> persistence, and limiting effects of the
> individual's symptoms to determine the
> extent to which the symptoms limit the
> individual's ability to do basic work
> activities.  For this purpose, whenever the
> individual's statements about the intensity,
> persistence, or functionally limiting
> effects of pain or other symptoms are not
> substantiated by objective medical evidence,
> the adjudicator must make a finding on the
> credibility of the individual's statements
> based on a consideration of the entire case
> record.

Id.

At step one, the ALJ found that Juraska's medically

determinable symptoms could reasonably be expected to cause the

alleged symptoms.  At step two, however, the ALJ found that her

"statements concerning the intensity, persistence and limiting

effects of those symptoms are not credible to the extent they
are inconsistent with the [] residual functional capacity
assessment."  Tr. at 14.  Juraska does not challenge the
accuracy or completeness of the ALJ's discussion of the medical
evidence, but alleges that the ALJ misjudged her activities of
daily living and misconstrued activities performed infrequently
as probative of her ability to perform full-time work.

     Specifically, Juraska argues that the ALJ placed too much
weight on: (1) her possession of a commercial driver's license,
which she claims she needed not for employment but to be able to
drive her only vehicle; (2) the finding that she drives loads of
firewood and thus sits for prolonged periods, without evidence
that she did this task frequently or that it required prolonged
sitting; and (3) that she helped her boyfriend lift a tailgate
onto a truck, a task that she attempted only once and was
incapable of doing without injuring herself.  I find no error in
the ALJ's reference to these points as indicative, at least
minimally, of whether Juraska was disabled.  Juraska was found
medically fit to obtain a commercial driver's license, drove her
truck at least occasionally, and at least once believed herself
able to help with a task requiring significant physical

exertion.  Moreover, as minor portions of a broader analysis, there is no indication that the ALJ placed excessive weight on these findings.

Juraska further asserts that the ALJ erred in finding that the activities in which she regularly engaged were consistent with the RFC determination.  The ALJ noted that she performed her own personal care, did household chores, and was able, during the day, to sit and read, watch television, and do crafts.  Although "a claimant's performance of household chores or the like ought not be equated to an ability to participate effectively in the workforce, evidence of daily activities can be used to support a negative credibility finding." Teixeira v. Astrue, 755 F.Supp.2d 340, 347 (D. Mass. 2010).  The ALJ was entitled to reference the enumerated activities, which, to some degree, oppugned Juraska's assertions that she was unable to perform sedentary work.

In addition to reviewing her activities of daily living, the ALJ discussed in substantial depth the other factors relevant to evaluating Juraska's credibility.  See Avery v. Heckler, 797 F.2d 19, 28-29 (1st Cir. 1986) (listing factors for consideration).  Because the ALJ discussed the relevant factors

27

and made a determination that is supported by substantial evidence, I have no grounds to disturb the finding.  Although Juraska cites ample evidence that tends to conflict with the ALJ's credibility determination, it is the responsibility of the Commissioner, not a reviewing court, to determine issues of credibility and resolve conflicts in the evidence.  Ortiz, 955 F.2d at 769.

## C.  <u>Weighing Opinion Evidence</u>

Juraska devotes one paragraph of her brief to challenging the manner in which the ALJ weighed the opinion evidence provided by medical sources.  She alleges that insufficient weight was attached to Ms. Hatch's opinion because even though Ms. Hatch does not qualify as an acceptable medical source, she was a treating source familiar with Juraska's conditions.  She also alleges that the ALJ undervalued Dr. Warren's opinion based on the erroneous notion that her opinion was inconsistent with her treatment notes.

In determining whether a claimant is disabled, the ALJ must review all of the relevant evidence, including opinion evidence from medical sources who are "acceptable medical sources" and from medical sources who do not meet that definition.  See 20

28

C.F.R. §§ 404.1527(b), 416.927(b); SSR 06-03p, 2006 WL 2329939, at *4 (Aug. 9, 2006).   If any evidence in the record, including medical opinions, is inconsistent with other evidence or is internally inconsistent, the ALJ must weigh all of the evidence to determine whether the claimant is disabled.   20 C.F.R. § 404.1527(c)(2).

I find that the ALJ appropriately weighed the various opinions presented as evidence in this case.   The ALJ was entitled to discount Ms. Hatch's opinion for the two grounds articulated in the opinion: she did not qualify as an "acceptable medical source," see 20 C.F.R. § 416.913(a), and there were inconsistencies between her reports and record evidence.   See SSR 06-03p, 2006 WL 2329939, at *4-5.   The ALJ was also entitled to discount, as unsupported by her own treatment notes and inconsistent with the totality of the evidence, the portion of Dr. Warren's opinion stating that Juraska could not work consistently due to depression and fatigue.   See id.   The ALJ's determinations are supported by substantial evidence, and Juraska has failed to present any reasoned explanation of why the ALJ's opinion analysis was inadequate.

**D.   Past Relevant Work Determination**

Juraska argues that the ALJ erred in finding that she had past relevant work as a telemarketer.  She contends that her 6 months on the job is insufficient for it to qualify as past relevant work.  This claim is without merit.

Previous substantial gainful activity qualifies as relevant work when it "lasted long enough for [the claimant] to learn to do it."  20 C.F.R. § 416.965(a) .  The Dictionary of Occupational Titles (DOT) specifies the amount of time required to learn a job based on its specific vocational preparation (SVP) level.  SSR 00-4p, 2000 WL 1898704, at *2-3 (Dec. 4, 2000).  The vocational expert who testified at Juraska's hearing stated that telemarketing has an SVP of 3.  Tr. at 58.  For work with an SVP of 3, the DOT states that "the amount of lapsed time required by a typical worker to learn the techniques, acquire the information, and develop the facility needed for average performance" can be as high as 3 months.  Dictionary of Occupational Titles, Appendix C, 1991 WL 688702 (4th ed. 1991). Because Juraska worked as a telemarketer for significantly longer than 3 months, her argument is unavailing.

**E.   Ability to Perform Past Relevant Work and Other Work**

Juraska argues that even if telemarketing qualifies as past relevant work, she is presently unable to perform such work. She asserts that she "failed" as a telemarketer because of the stress of the position, that the ALJ recognized her difficulties in social functioning and that such difficulties would be exacerbated by talking to often rude strangers, and that the ALJ's explicit limitation that she not have constant public interaction precludes her from performing telemarketing work. Insofar as she is disputing the RFC finding, Juraska offers no evidence or arguments that she has not already raised and that have not been discussed in previous sections of this order. Insofar as she claims that telemarketing is incompatible with the RFC and its specified limitations, Juraska fails to recognize that the ALJ only limited her to "face to face interactions with the general public," not all interaction.

Furthermore, even if telemarketing is inconsistent with Juraska's limitations, the ALJ determined, in the alternative, that Juraska could perform numerous other jobs that would not require substantial public interaction either in person or over the phone.  For example, the ALJ found that she would be able to perform the requirements of a document preparer, addressor, and

sorter.  Tr. at 17.  Thus, even if the ALJ had erred in finding that she could work as a telemarketer, the ALJ's determination that she is not disabled would still stand.

Juraska argues that for these alternatives to telemarketing, the ALJ failed to establish that sufficient jobs exist in the national and regional economy.  In finding an individual not disabled, the ALJ must show that a claimant is able to engage in "substantial gainful work which exists in the national economy."  42 U.S.C. § 423(d)(2)(A).  "'[W]ork which exists in the national economy' means work which exists in significant numbers either in the region where such individual lives or in several regions of the country."  Id.  "Isolated jobs that exist only in very limited numbers in relatively few locations outside of the region where [the individual] lives" do not qualify.  20 C.F.R. § 404.1566(b) .

In this case, for the alternative occupations discussed, the ALJ relied on the vocational expert's testimony that 148,000 jobs existed in the national economy and 610 existed in the regional economy, and that the enumerated jobs were just representative samples and not an exhaustive list of positions that one with the specified limitations could perform.  Tr. at

32

59.  I find that the ALJ adequately determined that sufficient jobs exist in the national economy.  See Johnson v. Chater, 108 F.3d 178, 180 (8th Cir. 1997) (finding sufficient 200 jobs in the state and 10,000 in the national economy, with note that the specific job was representative of a larger category); Vining v. Astrue, 720 F.Supp.2d 126, 128 (D. Me. 2010) (finding sufficient 10,000 to 11,000 jobs nationally).

Lastly, Juraska argues that the ALJ's hypotheticals to the vocational expert failed to include all of the limitations that appeared in the ALJ's final decision.  This argument is directly refuted by the record, which shows that the ALJ's questions included, nearly verbatim, all of the limitations subsequently enumerated in the opinion.  Compare Tr. at 12, with Tr. at 58, 60.  The ALJ fulfilled his obligation to accurately transmit the relevant medical limitations to the vocational expert.  See Arocho v. Sec'y of Health & Human Servs., 670 F.2d 374, 375 (1st Cir. 1982).

## IV.  CONCLUSION

For the foregoing reasons, I grant the Commissioner's motion to affirm (Doc. No. 10) and deny Juraska's motion to

reverse (Doc. No 8).  The clerk is directed to enter judgment
accordingly and close the case.

      SO ORDERED.


                          /s/Paul Barbadoro_____
                          Paul Barbadoro
                          United States District Judge

November 8, 2011

cc:   Leslie H Johnson, Esq.
      Robert J. Rabuck, Esq.

34